UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:13-cv-00109-MOC-DSC

| | |
|---|---|
| JACQUELINE RHODES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | MEMORANDUM OF DECISION |
| ) | and ORDER |
| ) | |
| ERIC A. JOHNSON; AND MUNICIPAL ) | |
| EMERGENCY SERVICES, INC., ) | |
| ) | |
| Defendants. ) | |

**THIS MATTER** is before the court on defendant's Motion for Summary Judgment. Having considered defendant's motion, plaintiff's response, defendant's reply, and plaintiff's submission of additional authority, and heard oral arguments, the court enters the following Order granting summary judgment and dismissing this action.

**FINDINGS and CONCLUSIONS**

**I.   Background**

   **A. Plaintiff's Claim**

Plaintiff, an hourly employee of defendant Municipal Emergency Service, Inc. (hereinafter "MES"), contends that she was subjected to sexual harassment in the workplace by defendant Eric Johnson (hereinafter "Johnson").[1] She contends that Johnson was a supervisor and MES contends he was plaintiff's coworker. Plaintiff asserts claims against MES under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), including claims for sexual harassment, constructive discharge, and retaliation.[2] Plaintiff has also asserted supplemental

---
[1]   Defendant Johnson has not been served and has not appeared as a party to this action.
[2]   The claims asserted against Johnson are not discussed as those issues never joined.

1

state-law claims for intentional infliction of emotional distress and negligent retention/supervision.

**B. Plaintiff's Employment**

Plaintiff was employed by MES in January 2010 and reported alleged harassment by Johnson to management on December 10, 2010. This was plaintiff's first and only complaint of harassment. In 2010, plaintiff was hired as a seamstress at MES's Charlotte facility at which firefighter clothing and equipment is cleaned and repaired. It is undisputed that Johnson was the Company's "technical expert in the cleaning and care of turnout gear." Hubregsen Dep. at 63. It is equally undisputed that Johnson oversaw the work of plaintiff, among others, as they executed repairs. While plaintiff contends that Johnson was a supervisor, it is undisputed that Johnson did not have authority to make employment decisions involving employee hiring, termination, promotion, transfer, demotion, reassignment to a different job classification, pay increases (or pay decreases), benefits changes, or written discipline. The evidence which has been presented shows that Johnson never made the decision to terminate any employee, that he had no authority to issue written disciplinary warnings to others, and he never issued a write-up to any employee. Further, the record is clear that he never hired, transferred, demoted, or reassigned any employee during his employment at MES. Hubregsen Decl. ¶ 8; Johnson Decl. ¶ 5.

It is equally undisputed that Johnson undertook certain administrative duties at the facility, there were five or six employees at that workplace, and Johnson was called "manager" by his co-workers as well as upper management. For example, it is undisputed that when plaintiff was hired in January 2010, it was Johnson who sent plaintiff an e-mail with her new hire paperwork. Pl. Dep. 27-28, Ex. 2.[3]

---

[3] While not relevant at this point, attached to that e-mail were several documents, including the

## C. Plaintiff's Claim of Harassment

As to the alleged underlying harassing conduct, there is a factual dispute as to what actually occurred. There is not, however, a dispute as to the timeline of the alleged harassment, plaintiff's report to management, and the actions management took to investigate the claim. According to plaintiff, the last day she was allegedly harassed by Johnson was December 7, 2010. Pl. Dep. 171-177, 270-272. On December 10, 2010, she reported the alleged harassment to Jody Brown (hereinafter "Brown"). Brown is the Vice President, Southeastern Region, of MES, whose office is located in Charlotte in a building separate from the cleaning facility. Hubregsen Decl. ¶ 2. Brown advised plaintiff that MES would begin an immediate investigation into her complaints and sent plaintiff home with pay. Hubregsen Decl. ¶ 12; Brown Dep. 97-98. It is undisputed that neither Brown nor Thomas Hubregsen (hereinafter "Hubregsen"), the President of MES, knew of the alleged misconduct before plaintiff brought her complaint to Brown.

## D. MES's Investigation

Brown immediately forwarded plaintiff's complaint to Hubregsen in accordance with the Integrity Policy. In turn, Hubregsen decided to take a direct role in the investigation of the allegation of harassment based on the seriousness of the allegation. Hubregsen Decl. ¶ 11. He took the following steps in initiating the investigation:

- physical separation of plaintiff and Johnson to allow him time to conduct an investigation;
- placement of plaintiff on an approved leave of absence with pay until the investigation was complete;

---

Company's Integrity Policy. Plaintiff testified during her deposition that she received the e-mail that had the Integrity Policy attached. Pl. Dep. 29.

- directed other MES employees to preserve evidence, including emails;

- contacted counsel to advise as to appropriate method to conduct the investigation;

- conduct in-person interviews with plaintiff, Johnson, and their co-workers;

- sent Johnson an email notifying him of the complaint, instructing him not to discuss the matter with others, and advising him that such discussions could lead to disciplinary actions;

- asked questions during the employee interviews based on written guidelines from counsel; and

- wrote a preamble to be read to each employee before the interview concerning confidentiality and encouraged the employees to be forthright in their answers by advising them that retaliation for participating in the investigation or providing information is against the law.

On Thursday, December 16, 2010, Hubregsen travelled to Charlotte to conduct the interviews with Brown. The six interviews were conducted on that day, which included an interview of plaintiff. After plaintiff explained her allegations, she told Hubregsen and Brown that she wanted Brown fired along with another co-worker and for third employee to be "educated." The co-workers were next interviewed and each worker was asked whether they had seen any verbal or physical misconduct by Johnson towards plaintiff. In turn, each employee answered in the negative. Finally, Johnson was interviewed at which Hubregsen and Brown outlined each allegation made by plaintiff. During his deposition, Hubregsen was asked to recount his line of questioning during the Johnson interview, and Hubregsen testified as follows:

> I asked him had he shown pornography on his computer. I asked him did he have any pornography on his computer. I asked him did he show nude pictures of himself on the silver camera to anybody. I asked him had he elicited sexual favors from Mrs. Rhodes. I asked him had he reached and taken candy from her

> candy dish and pushed himself onto her back on a number of occasions. I asked him about his interaction with Mrs. Rhodes' daughter.
>
> I asked him about Jason Tilley's visits to the cleaning and care center and Mr. Tilley engaging in sexual activity in the bathrooms or anywhere else in the facility. I asked him if Ms. Murray participated in any sexual activity in the office. I asked him if there was any discussion of a sexual nature in the cleaning and care center.
>
> I asked him about his relationship with Mrs. Rhodes. I asked him about his relationship with Jason Carpenter. I asked him about his relationship with Mrs. Pierson. I asked him about his relationship with Mrs. Murray. I asked him about the protocol he used when he met with other employees in the office.
>
> I asked him about how he managed the tools at the cleaning and care center. I asked him about the participation of families at the cleaning and care center, specifically about Mrs. Rhodes' daughter, about his own family in the cleaning and care center. I asked him about Tina Burkholder and her interview. I asked him about his interaction with Mrs. Burkholder.
>
> I asked him about his management style at the cleaning and care center. I asked him about work stations and how they were arranged and why they were arranged the way they were. I asked Mr. Johnson if there was anything else he thought he should tell me.
>
> \*\*\*
>
> I asked Mr. Johnson about an incident where he was chasing Mrs. Rhodes around the break room where Jason Carpenter had to get involved. I asked Mr. Johnson about his interaction with Jason Tilley and things that they talked about. I asked Mr. Johnson about Mr. Tilley's interaction with the other employees at the cleaning and care center. That's all I recall at this moment.

Hubregsen Dep. 131-133. According to Hubregsen and Brown, Johnson answered that he never touched plaintiff, that he never said anything inappropriate to her, and that he never showed her inappropriate pictures depicting nudity or sexual acts on a camera, phone, computer, or by any other device. Johnson Decl. ¶ 19; Hubregsen Decl. ¶ 22.

Johnson did, however, admit that he had engaged in consensual text messaging with a former MES applicant, Tina Burkholder. She was not an employee of MES and had never complained to MES concerning that relationship. Based on that revelation, Johnson was directed to write a statement concerning that relationship, which he did that day, and which Hubregsen forwarded to counsel for review. Hubregsen also reviewed the results of his interviews with counsel the evening of December 16, 2010. They agreed to speak again December 20, 2010.

5

On December 20, 2010, Hubregsen met with counsel and shared the information he had gathered from the interviews. He reported that he uncovered no information that could corroborate plaintiff's allegations against Johnson. He also reported that Johnson had disclosed conduct concerning text messaging with an applicant. Counsel did not recommend termination of Johnson.

Hubregsen then directed Ellen Cavanaugh (hereinafter "Cavanaugh"), MES's Welfare Benefits Manager, to contact plaintiff with the results of the investigation and provide plaintiff with an additional opportunity to add information in support of her contentions. Cavanaugh called plaintiff on December 22, 2010, and told her that the company was unable to confirm her accusations and told her she could return to work. Plaintiff refused to return unless MES fired Johnson, a proposal that was passed along to Hubregsen, who rejected it. Johnson was, however, disciplined for the text-messaging relationship with the MES applicant: he received a written warning and was placed on probation for 2011, discipline which he accepted. Johnson's administrative responsibilities were also removed, he was informed that any future deviation from corporate policy would result in immediate termination, and he was required to take a sexual harassment training course.

### E. Plaintiff's Resignation

On January 4, 2011, plaintiff sent an email to Hubregsen stating that if Johnson was going to remain employed, she "must decline to return to work per medical advice" and that, "[i]f you change your position and remove Mr. Johnson from my workplace I would reconsider returning to work." Hubregsen Dep. 215-216, Exh. 13. Hubregsen took such as plaintiff's resignation, which he accepted. Consistently, plaintiff testified that she resigned her employment at MES. Pl. Dep. 272-274.

## II. Summary Judgment Standard

Rule 56 was amended to give parties a "roadmap" for seeking and responding to a request for summary judgment. Rule 56(a), Federal Rules of Civil Procedure, provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a). The rule goes on to provide procedures for a party to use in responding to a Motion for Summary Judgment:

> **(c) Procedures.**
>
> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3) Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.
>
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

**III.    Discussion**

In sum, MES contends that it is protected from liability under Title VII because it had in place a written policy prohibiting workplace harassment or discrimination, that it took immediate steps to investigate plaintiff's allegations, that such investigation was adequate, and that Johnson was a co-worker and not plaintiff's supervisor. In response, plaintiff contends that its investigation was inadequate, that MES failed to conduct an appropriate examination of Johnson's workplace computer for pornography, and that Johnson was her supervisor. With such backdrop, the court reviews each Title VII claim to determine whether there are genuine issues of material fact which remain for trial.

**A. Hostile Work Environment Claim**

Title VII prohibits practices that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment ... Such discrimination includes maintaining a ... hostile work environment." Jordan v. Alternative Resources Corp., 458 F.3d 332, 339 (4th Cir.2006). "To state a hostile work environment claim, [Plaintiff] must allege that: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 764 (4th Cir.2003).

> The 'severe or pervasive' element of a hostile work environment claim has both subjective and objective components. First, the plaintiff must show that [s]he

9

> subjectively perceived the environment to be abusive. Next, the plaintiff must demonstrate that the conduct was such that a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive.

EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir.2008) (internal quotations and citations omitted). The Fourth Circuit has found that this is a high bar and that a plaintiff must

> identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion. That is, instances where the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere.

Id. at 316 (internal quotations omitted); see also EEOC v. Fairbrook Medical Clinic, 609 F.3d 320, 328–29 (4th Cir.2010) (denying summary judgment where supervisor targeted plaintiff with highly personalized comments about her breasts and sex drive designed to demean and humiliate her in front of co-workers and the public); Mosby–Grant v. City of Hagerstown, 630 F.3d 326, 336 (4th Cir.2010) (denying summary judgment where plaintiff showed that repeated comments about sexual encounters with young women and constant demeaning remarks about women caused her significant emotional distress). A totality of the circumstances test is applied when evaluating the question of whether alleged harassment altered the conditions of employment.

Critical to the inquiry is whether the alleged harasser is a co-worker or a supervisor. Here, plaintiff contends that Johnson was her supervisor. In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court determined that if the harasser is a supervisor who takes a tangible employment action against the employee victim, then the employer can be held to be vicariously liable for that supervisor's actions. Where the harasser is a supervisory employee who does not take a tangible employment action against the employee, then the employer could still be vicariously liable, with such liability subject to the employer's assertion of an affirmative defense that the employer took reasonable care to prevent and correct any harassment and the plaintiff failed to take advantage of those opportunities. Id. at 87. Where the alleged harasser is

10

not a supervisory employee, then Faragher provides that such employee is a co-worker, and plaintiff must come forward with evidence that the employer was negligent "with respect to the offensive behavior." Vance v. Ball State University, __ U.S. __, 133 S.Ct. 2434, 2241 (2013).

Thus, the first consideration is whether Johnson was plaintiff's supervisor or merely a co-worker, which is a question of law. In Vance, the Supreme Court significantly limited the definition of Title VII "supervisor" to those agents of the employer who have the authority to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Vance, 133 S. Ct. at 2444. This is a distinction with a difference: if the alleged harasser is a coworker of the plaintiff, liability attaches to the employer if the employer was "negligent in controlling the working conditions" id.; however, if the harasser was plaintiff's supervisor and the supervisor's harassment "culminates in a tangible employment action," the employer is strictly liable." Id. (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Where the alleged harasser is the supervisor, but the harassment does not culminate in a tangible employment action, liability will not attach if the employer can establish an affirmative defense that it exercised reasonable care to prevent and correct any harassing behavior and that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided. Id. at 2439.

Without doubt, plaintiff has presented evidence that Johnson was called "the manager" of the care facility, he inspected and oversaw the quality of the work of plaintiff, and he was also responsible for certain administrative duties, such as sending employment related materials to the workers in the facility. The situation presented here is not unlike the situation addressed in Vance: there, plaintiff was a catering assistance who alleged that she had been repeatedly

11

harassed by a catering specialist, Davis, who was given leadership responsibilities and lead or directed the work of plaintiff and other employee's in defendant's kitchen. Id. at 2454. The parties in Vance also agreed that Davis had no authority to hire, fire, promote, transfer, or discipline plaintiff.

While the plaintiff here has not explicitly conceded that Johnson lacked such authority from MES, there has been absolutely no evidence presented that he had any such authority making this matter virtually indistinguishable from the situation presented in Vance. At best, plaintiff has presented some evidence that Johnson was referred to as the "manager" of the care facility. The colloquial use of the term "supervisor" or "manager" is not controlling for purposes of Title VII. See Vance, 133 S.Ct. at 2444–46 (observing that "the term 'supervisor' has varying meanings both in colloquial usage and in the law" and for that reason a court cannot rely on the term's general usage for determining who is a supervisor under Title VII). While a co-employee may have been the plaintiff's "'supervisor' in the colloquial sense of the word, [he] did not possess the authority that would make him a supervisor for purposes of Title VII." Andonissamy v. Hewlett–Packard Co., 547 F.3d 841, 848 (7th Cir.2008).[4] Applying the standard set forth in Vance to the facts of this case, the court concludes, as a matter of law, that Johnson was not plaintiff's supervisor within the meaning of Title VII as none of the evidence submitted shows that Johnson was empowered to take tangible employment actions against plaintiff.

Having made such determination that the alleged harassment was by a co-worker, the burden is plaintiff's come forward with evidence upon which a jury could find that MES was negligent in controlling the working conditions at the care facility. Vance, 133 S. Ct. at 2444. To meet this standard, plaintiff must prove the employer "knew or should have known about the

---

[4] While Seventh Circuit decisions are not binding in the Fourth Circuit, Vance originated from the Seventh Circuit and the Supreme Court adopted the definition of "supervisor" used by that court. Thus, the opinion in Andonissamy is instructive.

[harassing] conduct and failed to stop it." Burlington Industries, Inc. v. Ellerth, 524 U.S. at 759. In this case, it is undisputed that plaintiff first told MES of the alleged harassing conduct on December 10, 2010, and MES took immediate and significant action to both investigate the complaint and protect plaintiff by granting her paid administrative leave while the investigation was underway. Equally, it is undisputed that plaintiff never suffered harassment again after the date she reported the alleged conduct to MES. AS outlined above, the company took significant steps to investigate plaintiff's claim, including employment of outside counsel, an in-person investigation lead by the company's president in which all employees in the facility were interviewed, review of the results of the investigation by counsel, communication of the results to plaintiff, and instructing plaintiff to return to work despite her contentions being unconfirmed by the investigation. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149 (2000) (holding that on summary judgment, a district court may consider "any other evidence that supports the employer's case.")

While plaintiff has pointed to MES's failure to do a forensic examination of the company's laptop during the investigation as evidence that the investigation was conducted negligently,[5] the fact that an expert hired for purposes of discovery found adult pornography on unallocated space on the unsecured laptop three years later is not evidence of a negligent investigation on the part of MES in 2010. Generally,

> to establish that an investigation into an alleged violation of a workplace policy was a pretext for discrimination it is not sufficient for the plaintiff to present evidence that the investigation was imperfect, incomplete, or arrived at a possibly incorrect conclusion.

---

[5] Plaintiff's assertion in her response that MES knew of the pornography on its computer in December 2010 is unsupported with any citation to evidence that would support such argument.

Pineda v. United Parcel Serv. Inc., 360 F.3d 483, 489 (5th Cir. 2004). In the Fourth Circuit, "a good faith investigation of alleged harassment may satisfy the 'prompt and adequate' response standard, even if the investigation turns up no evidence of harassment." Harris v. L & L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997) (citing Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752, 754 (11th Cir.1996)). In this case, while plaintiff has presented arguments critical of the investigation conducted by MES, she has presented no evidence that the investigation was a sham or that it was not intended to uncover the truth concerning the allegations of sexual harassment. Jordan v. Donahoe, 2013 WL 3893532 (E.D. Va. July 26, 2013), aff'd, 2014 WL 57775 (4th Cir. Jan. 8, 2014) (holding that an employer's investigation was "adequate" as a matter of law when manager ended investigation after conducting interviews with 17 co-workers (out of more than 100 co-workers available for interview), and none of the 17 interviewed co-workers corroborated plaintiff's accusations.) In this case, MES interviewed every employee in the care facility and while uncovering evidence of other misconduct by Johnson, it did not discover any evidence that would corroborate plaintiff's complaint.

Because plaintiff has failed to present evidence upon which a jury could find MES negligent, her Title VII hostile work environment claim fails as a matter of law.

**B. Constructive Discharge Claim**

Plaintiff's claim that she was constructively discharged when MES reported to her the results of the investigation and asked her to return to work also fails because plaintiff has presented no evidence that the employer deliberately made the working conditions intolerable in an effort to make her quit. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-354 (4th Cir. 1995). "Deliberateness" will be found to exist "only if the actions complained of were intended

14

by the employer as an effort to force plaintiff to quit." Taylor v. Virginia Union Univ., 193 F.3d 219, 237 (4th Cir.1999).

Reviewed in a light most favorable to plaintiff, she resigned from her employment when her complaints were uncorroborated by MES's investigation and MES refused to fire Johnson nonetheless. Title VII does not require an employer to give more weight to the version of events presented by the complainant when compared to that of the alleged harasser. Adams v. O'Reilly Auto., Inc., 538 F.3d 926, 930 (8th Cir. 2008). Where, as here, the employer conducts a reasonable investigation of the complaint and cannot corroborate the allegations of the complainant, it is under no obligation to fire the alleged harasser simply because the complainant wants that person out of the workplace. Despite plaintiff's argument in her response, the only evidence before this court is that plaintiff resigned when MES refused to fire Johnson. There is no evidence that she proposed any alternative working accommodation other than firing Johnson.

Finally, plaintiff has not been able to show how simply returning to work in the care facility would have been intolerable. Intolerability is "not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign." Blistein v. St. John's College, 74 F.3d 1459, 1468 (4th Cir. 1996), *overruled on other grounds by* Oubre v. Entergy Operations, Inc., 522 U.S. 422 (1998). Indeed, as this court has held, "[a]n employee who resigns without … giving her employer a reasonable chance to remedy the situation is not constructively discharged." Poteat v. PSC Auto. Grp., Inc., 2006 WL 2828836 at *4 (W.D.N.C. Sept. 29, 2006). While there may well have been a solution short of firing Johnson or having plaintiff work directly with Johnson, plaintiff failed to provide

MES with an opportunity to consider any such accommodation. Thus, plaintiff cannot show that she was constructively discharged.

### C. Title VII Retaliation Claim

A Title VII retaliation claim has three elements: (1) engagement in a protected activity; (2) adverse employment action by the employer; and (3) a causal link between the two events. E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005). While plaintiff certainly engaged in protected activity, she has presented absolutely no evidence of any adverse action as discussed above. This claim fails as a matter of law.

### D. State Law Claims

Plaintiff has also arguably asserted claims against MES for intentional infliction of emotional distress and negligent retention and supervision.[6] Where, as here, such supplemental state-law claims are based on the same conduct underlying the federal Title VII claims, the state law claims are preempted. Mwabira–Simera v. Thompson Hospitality Services, LLP, 2012 WL 959383 (D.Md. March 20, 2012); Samuels v. Two Farms, Inc., 2012 WL 261196 (D.Md. Jan.

---

[6] Plaintiff has also asserted as a cause of action a claim for "punitive damages." North Carolina does not recognize a "cause of action" for punitive damages. Instead, punitive damages may be sought in an *ad damnum* clause or a prayer for relief for damages for some other tort that would support punitive damages. As a matter of state law, "punitive damages" is not a cause of action, but is instead a remedy available in very limited circumstances.

> As a general rule, "[p]unitive damages do not and cannot exist as an independent cause of action, but are mere incidents of the cause of action and can never constitute a basis for it. If the injured party has no cause of action independent of a supposed right to recover punitive damages, then he has no cause of action at all." J. Stein, Damages and Recovery § 195 at 389 (1972). North Carolina follows this general rule of law.

Hawkins v. Hawkins, 101 N.C.App. 529, 532 (1991). To the extent plaintiff has attempted to assert punitive damages as a freestanding cause of action, it is dismissed for failure to state a claim.

16

27, 2012); Brown v. Children's Nat. Medical Center, 773 F.Supp.2d 125, 138–39 (D.D.C.2011); Wade v. Washington Metropolitan Area Transit Authority, 2005 WL 1513137 (D.D.C. June 27, 2005) ("The precisely drawn, detailed Title VII preempts the more general common law negligence remedy.") (citation omitted); Crosten v. Kamauf, 932 F.Supp. 676, 684 (D.Md.1996). Moreover, "[w]hen, as here, the victim of a discriminatory act [does not] allege [ ] a harm apart from discrimination, Title VII ... preclude[s] her from suing under a common law tort theory to remedy that [same] injury." Boyd v. O'Neill, 273 F.Supp.2d 92, 96 (D.D.C.2003). Thus, the court dismisses the state-law claims asserted against MES as they are preempted.

IV.     Motions To Strike

The court has ordered the destruction of the CD-ROM submitted to chambers by plaintiff without viewing its contents. As discussed above, the court has accepted plaintiff's description of what such disk contained and where and when it was found. For purposes of preserving a record for appeal, plaintiff shall maintain the original of the CD-ROM until such time as the Judgment entered herein becomes final.

**ORDER**

**IT IS, THEREFORE, ORDERED** that

(1) defendants' Motion for Summary Judgment (#79) is **GRANTED**;

(2) plaintiff's Motions to Strike (#93 & #94) are **GRANTED** in part and **DENIED** in part; and

(3) the Clerk of Court is instructed to enter Judgment as follows: **JUDGMENT** is entered in favor of Defendant MES and against plaintiff providing that plaintiff have and take nothing of Defendant MES and plaintiff's claims against such defendant are **DISMISSED WITH PREJUDICE**. The claims asserted by plaintiff against

17

Defendant Johnson are **DISMISSED WITHOUT PREJUDICE** for lack of joinder of such defendant or the claims asserted against him;

(4) the Motion to Continue Docket Call/Trial (#110) is **DENIED AS MOOT**; and

(5) this action is terminated.

Signed: June 5, 2014

Max O. Cogburn Jr.
United States District Judge